IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge William J. Martínez

Civil Action No. 16-cv-2129-WJM-MEH

CHADWICK S. LIVINGSTON,

    Plaintiff,

v.

OFFICER ADAM WRIGHT, in his individual and official capacities;
OFFICER JACOB GERSON, in his individual and official capacities;
JOHN and JANE DOE, an officer or officers of the Englewood Police Department, as yet unidentified, in their individual and official capacities;

    Defendants.

---

**ORDER GRANTING IN PART AND DENYING IN PART
DEFENDANTS' MOTION TO DISMISS**

---

Plaintiff Chadwick S. Livingston ("Livingston") brings this civil rights action against Englewood Police Officers Adam Wright ("Wright"), Jacob Gerson ("Gerson"), and John and Jane Doe (together, "Defendants"), alleging that they subjected him to excessive force in violation of the Fourth Amendment, and/or failed to intervene in each other's use of excessive force. (ECF No. 45.) Before the Court is Defendants' Motion to Dismiss. (ECF No. 53.) As explained in detail below, the Court grants this motion as to one specific theory of excessive force liability, as to Wright and Gerson in their official capacities, and as to John and Jane Doe, but the motion is otherwise denied.

## I. LEGAL STANDARD

Under Federal Rule of Civil Procedure 12(b)(6), a party may move to dismiss a claim in a complaint for "failure to state a claim upon which relief can be granted." The

12(b)(6) standard requires the Court to "assume the truth of the plaintiff's well-pleaded factual allegations and view them in the light most favorable to the plaintiff." *Ridge at Red Hawk, LLC v. Schneider*, 493 F.3d 1174, 1177 (10th Cir. 2007). In ruling on such a motion, the dispositive inquiry is "whether the complaint contains 'enough facts to state a claim to relief that is plausible on its face.'" *Id.* (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Granting a motion to dismiss "is a harsh remedy which must be cautiously studied, not only to effectuate the spirit of the liberal rules of pleading but also to protect the interests of justice." *Dias v. City & Cnty. of Denver*, 567 F.3d 1169, 1178 (10th Cir. 2009) (internal quotation marks omitted). "Thus, 'a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely.'" *Id.* (quoting *Twombly*, 550 U.S. at 556).

## II. FACTS

The Court accepts the following allegations as true for purposes of this motion.

Livingston, a 38-year-old male at the time of the incident in question, "suffers from recurring seizures." (ECF No. 45 at 5–6.) He has a handicap placard hanging from the rearview mirror of his vehicle (*id.* ¶ 7), although it is not clear if he received this handicap placard on account of his seizures.

Livingston was driving to meet some friends on August 23, 2014. (*Id.* ¶ 6.) As he was driving, he began to recognize the onset of seizure symptoms. (*Id.* ¶ 8.) "He pulled into a nearby residential driveway in an attempt to minimize any possible danger to himself and to others." (*Id.*) However, the most serious effects of the seizure came quickly and Livingston was not able to put the vehicle in park or turn off the engine

2

before he lost control of his limbs. (*Id.* ¶ 9.) His vehicle drifted into the corner of a detached garage and came to a stop there, with the engine still running. (*Id.*)

At around 8:00 PM, Wright and Gerson arrived at the scene to investigate a report that a vehicle had collided with a residential structure. (*Id.* ¶ 10.) As the seizure symptoms dissipated, Livingston noticed the officers outside of his vehicle. (*Id.* ¶ 11.) Wright approached the driver's side of the vehicle with his gun drawn and aimed at Livingston. (*Id.*) Wright and Gerson were yelling at Livingston and one of them asked if he was on drugs. (*Id.*)

Apart from the lingering seizure symptoms, the site of a gun pointed at him exacerbated Livingston's inability to speak or move normally, and he feared for his life. (*Id.* ¶ 12.) He was unable to speak or otherwise respond to the officers' questions and commands, and was too weak to exit his vehicle. (*Id.* ¶ 13.) Wright soon opened Livingston's driver's side door and "facilitated [his] exit from the vehicle." (*Id.*) Presumably Wright had holstered his gun by this point.

After helping Livingston out of the vehicle, Wright forced Livingston to the concrete pavement, chest first, with his head turned sharply to the side. (*Id.* ¶ 14.) Livingston "did not resist and lacked the strength and motor control to do so." (*Id.*) Wright, possibly with Gerson's assistance, then "wrenched [Livingston's] arms behind his back and placed him in handcuffs." (*Id.*) "This was done with such force that it caused severe and lasting injuries to [Livingston's] shoulders and arms, including tears to the tendon in his left bicep and to a tendon in his right shoulder." (*Id.*) "These are not . . . injuries that one would expect in a suspect who is not resisting and [who] lacked the strength and ability to resist." (*Id.* ¶ 23.)

The portion of the encounter involving Wright's drawn firearm and the portion involving Livingston's rough handcuffing procedure "were [both] acts which occurred over the span of a few minutes and not instantaneously." (*Id.* ¶ 15.) Once Livingston was cuffed, Wright and Gerson "jerked [him] from the ground using the handcuffs as well as [his] belt." (*Id.* ¶ 17.) He was thus lifted and carried into the back of a police car. (*Id.* ¶¶ 18–19.) Being carried this way "plac[ed] additional severe and unnecessary pressure on [Livingston's] back and shoulders and caused him further injury." (*Id.* ¶ 17.)

While in the police car, Livingston suffered another seizure. (*Id.* ¶ 19.) Paramedics soon arrived, examined Livingston, and transported him to a medical facility for treatment and evaluation. (*Id.* ¶¶ 19–20.)

Livingston was never cited for any violation in connection with this incident. (*Id.* ¶ 21.) He now sues Wright and Gerson under 42 U.S.C. § 1983, claiming that they applied excessive force in violation of the Fourth Amendment. (*Id.* ¶¶ 30–41.) He also sues them for failing to intervene in each other's allegedly unconstitutional actions. (*Id.* ¶¶ 42–57.) Finally, he names a John Doe defendant and a Jane Doe defendant, who are "as yet unknown officers of the [Englewood Police Department]" and who may have been present and participating in the various allegedly unconstitutional acts, or who failed to intervene. (*Id.* ¶ 38; *see also id.* ¶ 52.)

### III. ANALYSIS

**A.    General Standards**

1.    Excessive Force

"[A]ll claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen

4

should be analyzed under the Fourth Amendment and its 'reasonableness' standard . . . ." *Graham v. Connor*, 490 U.S. 386, 395 (1989) (emphasis removed). Under this standard, "the question is whether the officers' actions are objectively reasonable in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Morris v. Noe*, 672 F.3d 1185, 1195 (10th Cir. 2012).

Applying this standard "requires careful attention to the facts and circumstances of each particular case, including [1] the severity of the crime at issue, [2] whether the suspect poses an immediate threat to the safety of the officers or others, and [3] whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396 (1989); *see also Lundstrom v. Romero*, 616 F.3d 1108, 1126 (10th Cir. 2010) (referring to the *Graham* factors as the "three, non-exclusive factors relevant to [an] excessive force inquiry"). The Court may further consider whether "the officers' own reckless or deliberate conduct during the seizure unreasonably created the need to use such force." *Cordova v. Aragon*, 569 F.3d 1183, 1188 (10th Cir. 2009) (internal quotation marks omitted).

2. Qualified Immunity

Defendants assert qualified immunity. "Qualified immunity shields federal and state officials from money damages unless a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011). "The judges of the district courts . . . [may] exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson v.*

5

*Callahan*, 555 U.S. 223, 236 (2009).

The plaintiff bears the burden of demonstrating that the law was clearly established at the relevant time. *Lybrook v. Members of Farmington Mun. Sch. Bd. of Educ.*, 232 F.3d 1334, 1337 (10th Cir. 2000). "A right is clearly established in this circuit when a Supreme Court or Tenth Circuit decision is on point, or if the clearly established weight of authority from other courts shows that the right must be as the plaintiff maintains." *Thomas v. Kaven*, 765 F.3d 1183, 1194 (10th Cir. 2014) (internal quotation marks omitted). Nonetheless, the clearly established prong

> involves more than a scavenger hunt for prior cases with precisely the same facts. The more obviously egregious the conduct in light of prevailing constitutional principles, the less specificity is required from prior case law to clearly establish the violation. The Supreme Court has cautioned [lower] courts not to define clearly established law at a high level of generality, but to focus on whether the violative nature of particular conduct is clearly established.

*Perea v. Baca*, 817 F.3d 1198, 1204 (10th Cir. 2016) (internal quotation marks and citations omitted).

**B.     The Crime in Question**

As noted, the excessive force analysis usually involves an inquiry into the suspected crime at issue, the threat posed by the suspect, and whether the suspect was resisting or evading arrest. Although Livingston has multiple theories of excessive force, the Court first discusses the crime at issue, because this factor remains constant throughout Livingston's various theories.

Livingston claims that the most serious offenses of which Defendants could have suspected him under the circumstances were driving under the influence and/or reckless driving. (ECF No. 63 at 3.) These are presumptively misdemeanors under

6

Colorado law. *See* Colo. Rev. Stat. § 42-4-1301(1)(a)–(b) (driving under the influence and driving while impaired are misdemeanors unless the accused has three similar prior convictions); Colo. Rev. Stat. § 42-4-1401 (reckless driving is a misdemeanor). Defendants do not dispute that these are the only offenses they could have reasonably suspected when they approached Livingston's vehicle. (*See* ECF No. 66 at 4 ("accepting" Livingston's "speculation" and arguing that Defendants nonetheless complied with the Fourth Amendment).)

Well before the incident in question, it has been clearly established in the Tenth Circuit that misdemeanor offenses generally justify less force, and sometimes no force. *See Morris*, 672 F.3d at 1195; *Fisher v. City of Las Cruces*, 584 F.3d 888, 895 (10th Cir. 2009); *Fogarty v. Gallegos*, 523 F.3d 1147, 1160 (10th Cir. 2008); *see also Davis v. Clifford*, 825 F.3d 1131, 1135 (10th Cir. 2016) (reaffirming this view); *Perea*, 817 F.3d at 1202–03 (same). Thus, this factor weighs against Defendants on all of Livingston's excessive force theories. The Court now turns to those specific theories.

## C. Wright's Gun Aimed at Livingston

Wright had his gun out and pointed at Livingston as he approached Livingston's vehicle, and during the initial encounter (apparently up to the point when Wright "facilitated" Livingston's exit from the vehicle). Livingston claims that this threatening display amounted to excessive force.

In some situations, a police officer's choice to point his or her firearm at another can amount to excessive force. *See, e.g., Holland ex rel. Overdorff v. Harrington*, 268 F.3d 1179, 1193 (10th Cir. 2001) ("Where a person has submitted to the officers' show of force without resistance, and where an officer has no reasonable cause to believe

7

that person poses a danger to the officer or to others, it may be excessive and unreasonable to continue to aim a loaded firearm directly at that person, in contrast to simply holding the weapon in a fashion ready for immediate use."). Here, Wright approached a still-running vehicle that had collided with a residential structure, knowing nothing about the vehicle's driver or what business the driver had to be in that location. Livingston has failed to proffer any case law (predating the incident or otherwise) analyzing a scenario reasonably analogous to the one Wright confronted. Moreover, Wright points out that case law tends to run in his favor on this question. *See Henry v. Storey*, 658 F.3d 1235, 1239 (10th Cir. 2011) (in the context of the three-factor *Graham* analysis, finding that an officer's display of his firearm was not excessive force because, among other things, "the means of evading arrest were close at hand: the driver was in the vehicle with the engine running"). Further, when used to flee from police, a running vehicle also poses a significant danger to the public.

Thus, although the most serious offense Wright could have suspected at that time was a misdemeanor, the other *Graham* factors tip in his favor at the outset of the encounter, and Livingston has failed to show case law to the contrary. Wright is accordingly entitled to qualified immunity to the extent Livingston claims that Wright violated the Fourth Amendment by aiming his gun at Livingston as he approached Livingston's vehicle for the first time.

**D.    Wrenching Livingston's Arms and Shoulders**

Livingston next claims that Wright used unreasonable force to handcuff him while he was on the ground, outside of his vehicle. Livingston also claims that Gerson either assisted Wright in applying such force, or failed to intervene as he observed Wright

8

doing so (the latter contention is addressed in Part III.F, below).

Now that Livingston was out of his vehicle and on the ground, there is no indication that he posed any threat to the safety of Wright, Gerson, or anyone else. To the contrary, Wright had just "facilitated" Livingston's exit from his vehicle, which plausibly suggests some important considerations. First, Wright and Gerson knew that Livingston was too weak to exit on his own. Second, they likely concluded that his behavior was non-threatening—otherwise, Wright would not have approached closely enough to make physical contact with him. Finally, by this point (if not earlier) Wright and Gerson should have seen the handicap placard hanging from Wright's rearview mirror. Thus, as to the first *Graham* factor, the record suggests that Livingston posed no threat, and that Defendants understood as much.

The record similarly suggests that Livingston was not resisting or attempting to evade arrest (the second *Graham* factor). Defendants try to imply that the effects of Livingston's seizure required them to move his arms forcefully. (*See* ECF No. 53 at 8 ("By Plaintiff's own admission, he was unable to control his body movements as a result of the seizure. Officers Wright and Gerson had to assist Plaintiff in moving his arms behind his back to complete handcuffing and to get Plaintiff off of the ground.").) However, the complaint alleges that Livingston was by this time lethargic and unable to move his limbs voluntarily, not that he was rigid, thrashing, or otherwise difficult to manipulate.

Combining the foregoing considerations with the fact that Livingston could be suspected, at most, of misdemeanor traffic offenses, none of the *Graham* factors weighs in favor of Defendants. If Defendants in truth acted as Livingston alleges, they

9

violated his Fourth Amendment right to be free from excessive force.

The question, then, is whether the right was clearly established. In excessive force cases, the Tenth Circuit generally does not require a plaintiff to proffer case law with facts precisely on point. Moreover, "when an officer's violation of the Fourth Amendment is particularly clear from *Graham* itself, we do not require a second decision with greater specificity to clearly establish the law." *Casey v. City of Fed. Heights*, 509 F.3d 1278, 1284 (10th Cir. 2007).

Livingston primarily points to *Fisher*, *supra*, which the Tenth Circuit decided in 2009, well before the August 2014 incident that prompted this lawsuit. The plaintiff there, Robert Fisher, accidentally shot himself in the stomach and bicep during a drug-induced hallucinatory episode in his backyard. 584 F.3d at 891–92. By the time two police officers arrived in Fisher's backyard, Fisher's wife had retrieved the gun and put it inside the house. *Id.* at 892. After viewing Fisher's clear distress, one of the police officers went inside the house, secured the gun, and then returned to the backyard. *Id.* The officers then ordered Fisher "to lay flat on his wounded stomach and spread his arms over his head." *Id.* Fisher twice refused on account of his bleeding stomach wound, and then one of the officers "proceeded to handcuff Fisher behind his back, a process that necessitated, because of the swelling to Fisher's bicep, that she place her knee into Fisher's back in order to leverage his arms behind his body." *Id.* The manner of handcuffing, combined with his wounds, caused excruciating pain. *Id.*

The Tenth Circuit proceeded through the three *Graham* factors to determine whether Fisher had stated a constitutional violation. As to the first factor, the Tenth Circuit noted that the only crime of which the police officers could have suspected

Fisher at that time was a misdemeanor for discharging a firearm within city limits. *Id.* at 895. As to the second factor, the Tenth Circuit acknowledged "that by the time the officers handcuffed Fisher, the officers had frisked Fisher; had taken possession of the gun he had fired; had witnessed the severity of Fisher's wounds; and had started to provide Fisher with first aid to stop the flow of blood." *Id.* Moreover, "[p]rior to taking Fisher into custody, the officers also felt comfortable enough with the situation to leave [one of them] alone with Fisher, un-handcuffed[, as the other secured the gun]." *Id.* As to the third factor, the Tenth Circuit determined that "a reasonable jury could fairly conclude that Fisher was not actively resisting arrest . . . but was only pleading to be handled and handcuffed in a fashion that did not exacerbate his injuries." *Id.* at 896.

The Court agrees with Livingston that the *Fisher* decision is close enough to this case to show that his Fourth Amendment rights, as allegedly violated by Defendants, were clearly established in August 2014. In both scenarios, officers encountered an individual who had become medically incapable of posing any serious threat or flight risk, and who could be suspected of nothing more than a misdemeanor. *See also Davis*, 825 F.3d at 1137 ("it is, and was [as of 2012], clearly established law that the use of disproportionate force to arrest an individual who has not committed a serious crime and who poses no threat to herself or others constitutes excessive force"); *Fogarty*, 523 F.3d at 1161 (finding it clearly established as of 2003 that the use of force against an arrestee who committed a petty misdemeanor, posed no threat to others, and did not resist arrest, was unlawful).

Moreover, it has been established since 2008 "that the use of force adequate to tear a tendon is unreasonable against a fully restrained arrestee." *Id.* at 1162.

11

Livingston was not a fully restrained arrestee when his arms were wrenched into handcuffing position, but his lethargy and loss of motor control put him in a functionally equivalent situation.

Accordingly, on the facts as pleaded by Livingston, Wright is not entitled to qualified immunity for the violent manner in which he manipulated Livingston's arms. Gerson, to the extent he participated, is likewise not entitled to qualified immunity on this record.[1]

### E.     Carrying Livingston to the Police Vehicle

The third alleged instance of excessive force was Wright's and Gerson's act of lifting Livingston by the handcuffs and belt to carry him to the back of a police car. Livingston does not allege that Wright or Gerson knew, as of that moment, that the handcuffing procedure had already torn some of Livingston's tendons.

Given Livingston's post-seizure condition, it is unsurprising that Wright and Gerson needed to lift Livingston in *some* manner.  However, it is obvious that being pulled upward by the chain of the handcuffs attached to one's wrists behind one's back would put enormous stress on the shoulder joints, at a minimum, and would likely cause significant pain.  Thus, whether or not Wright and Livingston knew of the injuries Livingston had just sustained, they certainly applied potentially unreasonable force in the act of lifting Livingston by the chain of the handcuffs.

The *Graham* analysis here differs in no material respect from the analysis before

---

[1] Defendants' implied view of the facts—*i.e.*, that Livingston's seizure symptoms rendered him especially difficult to subdue—may be borne out by discovery, but the Court must accept Plaintiff's allegations at this point.  Even in a summary judgment posture, however, such a factual dispute would likely prevent application of qualified immunity.  *See, e.g.*, *Lundstrom v. Romero*, 616 F.3d 1108, 1126–27 (10th Cir. 2010); *Fisher*, 584 F.3d at 895–96.

Livingston was handcuffed, except perhaps that the analysis favors Livingston even more strongly. By the time Livingston was handcuffed, he posed *less* of a potential threat or flight risk than he had posed before (and he posed barely any risk to begin with). Thus, the *Graham* analysis demonstrates that Livingston has pleaded a constitutional violation.

As for clearly established law, it was clearly established as of 2011 "that officers may not continue to use force against a suspect who is effectively subdued." *Perea*, 817 F.3d at 1204 (analyzing a 2011 use-of-force encounter). Livingston was not just effectively subdued, but was entirely incapable of resisting. Thus, neither Wright nor Gerson is entitled to qualified immunity on the facts as currently alleged.

## F. Failure to Intervene

"An officer who fails to intervene to prevent a fellow officer's excessive use of force may be liable under § 1983." *Fogarty*, 523 F.3d at 1162. This has been clearly established for decades in the Tenth Circuit. *See Mick v. Brewer*, 76 F.3d 1127, 1136 (10th Cir. 1996) (citing cases from the 1980s to show that the duty to intervene in an excessive force incident had been clearly established at least as of 1992). "In order for liability to attach," however, "there must have been a realistic opportunity to intervene to prevent the harm from occurring. Whether an officer had sufficient time to intercede or was capable of preventing the harm being caused by another officer is [usually] an issue of fact . . . ." *Vondrak v. City of Las Cruces*, 535 F.3d 1198, 1210 (10th Cir. 2008).[2]

---

[2] The parties both cite to *O'Neill v. Krzeminski*, 839 F.2d 9 (2d Cir. 1988), for the background principles governing failure-to-intervene claims, and both parties' citations erroneously designate it a "10th Cir." decision. (ECF No. 53 at 5; ECF No. 63 at 13.) Although

Livingston's failure-to-intervene claim is largely directed at: (1) Gerson's failure to stop Wright from aiming his gun that Livingston; and (2) to the extent Gerson did not personally participate in the handcuffing process, Gerson's failure to stop Wright from wrenching Livingston's arms during the handcuffing process. The Court has already found that Wright's use of his gun violated no clearly established law. Thus, the ensuing analysis focuses only on Gerson's failure to intervene in Wright's unduly violent handcuffing method.

In this light, the only real question is whether Gerson had a realistic opportunity to prevent Wright's wrenching motion. Although wrenching motions generally happen quickly, Livingston alleges it "occurred over the span of a few minutes and not instantaneously." (ECF No. 45 ¶ 15.) There is nothing conclusory or inherently implausible about this allegation, and so the Court must accept it as true. Although discovery may reveal to the contrary, Livingston's facts, as pleaded, show that Gerson had an opportunity to intervene in what the Court has already found to be an act of excessive force (if it happened as Livingston alleges). Thus, Livingston has stated a viable claim that Gerson violated his clearly established rights by failing to intervene.

## G.    Official Capacity Claims

Livingston names Wright and Gerson as defendants both in their individual and official capacities. Defendants argue that Livingston fails to state a proper official-capacity claim. (ECF No. 53 at 15.)

A suit against a government official is his or her official capacity is equivalent to a suit against the governmental entity for whom the official works. *Kentucky v. Graham*,

---

*O'Neill* is consistent with Tenth Circuit authority, it is plainly a Second Circuit decision.

473 U.S. 159, 165–66 (1985). Thus, suing Defendants in their official capacities is equivalent to a suit against the City of Englewood. However, Livingston has pleaded nothing to suggest Englewood's liability under § 1983, such as a municipal policy that caused Defendants to act as they did, or a failure to train Defendants on Fourth Amendment use-of-force principles. Moreover, Livingston cannot allege that Defendants violated his Fourth Amendment rights and simply assume that Englewood must be responsible in some sense. *See, e.g., Salazar v. Castillo*, 2013 WL 69154, at *6 (D. Colo. Jan. 7, 2013) ("Plaintiff cannot state a plausible claim of municipal liability by identifying a single incident of alleged violations and then, without any further factual substantiation, contending that such actions were consistent with and caused by a municipal policy, procedure, or failure to train.").

Wright and Gerson will be dismissed to the extent they are named in their official capacities.

**H.    The Doe Defendants**

Finally, Defendants argue that Livingston has failed to state a claim against John or Jane Doe, largely because Livingston has failed to provide any reason to believe that John or Jane Doe exist—*i.e.*, that other officers may have been on the scene. (ECF No. 53 at 4–6.) Livingston very briefly responds, "If Plaintiff's claims survive, they should be found just as valid against any officers who were present whose identities are at this time unknown." (ECF No. 63 at 14.) He then adds, confusingly, "The existence and identities of any such officers should be permitted to proceed pending appropriate discovery." (*Id.*)

A plaintiff may appropriately name John and Jane Doe defendants when the

15

plaintiff knows or has strong reason to suspect that others may be liable for his or her injuries, but some obstacle has stymied the plaintiff's reasonable efforts to learn those defendants' true identities. *See* 2 James Wm. Moore *et al.*, *Moore's Federal Practice* § 10.02[2][d][i] (2017). Livingston, by contrast, is using John and Jane Doe purely as placeholders for officers that he might learn about in the future, if any. Livingston may pursue discovery to learn if any other officers were present, but naming a John or Jane Doe defendant does not increase the chances that he can add additional police defendants as he learns about them. In particular, with respect to federal-law claims, naming Doe defendants does not prevent the statute of limitations from expiring as against whomever those defendants might be. *Watson v. Unipress, Inc.*, 733 F.2d 1386, 1389–90 (10th Cir. 1984).

Accordingly, the Court agrees that Livingston has failed to state any claim against John or Jane Doe, and those defendants will be dismissed.

## IV. CONCLUSION

For the reasons set forth above, the Court ORDERS as follows:

1. Defendant's Motion to Dismiss Plaintiff's Amended Complaint (ECF No. 53) is GRANTED to the following extent, but otherwise DENIED:

    a. any claim based on Defendant Wright's choice to point his weapon at Livingston during the initial encounter is dismissed;

    b. Defendants Wright and Gerson are dismissed in their official capacities (they shall remain defendants in their individual capacities); and

    c. Defendants John and Jane Doe are dismissed, and the Clerk shall terminate them as parties;

2. The stay of discovery (ECF No. 51) is LIFTED; and

3. As ordered by the Magistrate Judge, the parties must submit a status report within five business days of this Order.

Dated this 6th day of September, 2017.

BY THE COURT:

_____
William J. Martinez
United States District Judge