IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge William J. Martínez

Civil Action No. 16-cv-2129-WJM-MEH

CHADWICK S. LIVINGSTON,

  Plaintiff,

v.

OFFICER ADAM WRIGHT, in his individual capacity; and
OFFICER JACOB GERSON, in his individual capacity,

  Defendants.

**ORDER GRANTING IN PART AND DENYING IN PART
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Plaintiff Chadwick S. Livingston ("Livingston") brings this civil rights action against Englewood Police Officers Adam Wright ("Wright") and Jacob Gerson ("Gerson") (together, "Defendants"), alleging that they subjected him to excessive force in violation of the Fourth Amendment, and/or failed to intervene in each other's use of excessive force. (ECF No. 45.)

Before the Court is Defendants' Motion for Summary Judgment. (ECF No. 97.) For the reasons explained below, the motion is granted as to Gerson's potential liability for a part of Livingston's claimed injuries, but otherwise denied. The parties will be referred to the Magistrate Judge to schedule a Final Pretrial Conference.

### I. LEGAL STANDARD

Summary judgment is warranted under Federal Rule of Civil Procedure 56 "if the movant shows that there is no genuine dispute as to any material fact and the movant is

entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–50 (1986). A fact is "material" if, under the relevant substantive law, it is essential to proper disposition of the claim. *Wright v. Abbott Labs., Inc.*, 259 F.3d 1226, 1231–32 (10th Cir. 2001). An issue is "genuine" if the evidence is such that it might lead a reasonable trier of fact to return a verdict for the nonmoving party. *Allen v. Muskogee*, 119 F.3d 837, 839 (10th Cir. 1997).

In analyzing a motion for summary judgment, a court must view the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party. *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998) (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). In addition, the Court must resolve factual ambiguities against the moving party, thus favoring the right to a trial. *See Houston v. Nat'l Gen. Ins. Co.*, 817 F.2d 83, 85 (10th Cir. 1987).

## II. BACKGROUND

The following facts are undisputed unless attributed to a party or otherwise noted.

On the evening of August 23, 2014, Livingston was driving through Englewood, Colorado, on his way to a card game with some friends. (ECF No. 97 at 4, ¶ 1.)[1] He was driving a Ford F350 pickup truck, and his dog (a very protective German Shepherd) was in the cab of the truck with him. (*Id.*; ECF No. 97-1 at 7.)

Livingston suffers from seizures due to head injuries. (ECF No. 97 at 4, ¶ 2.) During his drive that evening, he began experiencing symptoms presaging a seizure. (*Id.* ¶ 1.) He quickly turned onto a residential street and into a driveway leading to a

---

[1] All ECF page citations are to the page number in the CM/ECF header, which does not always match the document's internal pagination, particularly in exhibits.

detached garage, and slammed his brakes.  (*Id.* ¶¶ 3, 5.)  The seizure then fully took effect and Livingston lost consciousness.  (*Id.* ¶ 4.)  During his unconscious state, his vehicle remained in drive and his foot somehow depressed the gas pedal, causing the vehicle to collide with a divider between two of the detached garage's garage doors.  (*Id.* ¶ 5; ECF No. 97-1 at 13; ECF No. 97-2.)  The divider prevented Livingston's truck from moving further, so Livingston's rear tires began to spin in place.  (ECF No. 97 at 5, ¶ 8; ECF No. 97-1 at 5.)

Passersby soon called the police.  (ECF No. 97 at 5, ¶ 7.)  The first to arrive at the scene was Wright.  (*Id.* ¶ 8.)  At first, Wright could not see who was inside the truck because Livingston's rear tires were generating "extensive amounts of smoke."  (*Id.* ¶¶ 8, 10.)  The revving engine and spinning tires also created a lot of noise.  (*Id.* ¶ 8.)  Livingston had a handicap placard on his dashboard but Wright never saw it (either initially or later).  (*Id.* at 7, ¶ 24.)

Wright believed that the vehicle's driver might be intoxicated and attempting to flee the scene.  (*Id.* at 5, ¶ 9.)  He therefore cautiously approached the driver's side door.  (*Id.* ¶ 10.)  Around this time, Gerson arrived and provided cover.  (*Id.*)

As Wright approached, he shouted commands for Livingston "to put his hands on his face, turn the car off, and get out of the truck."  (*Id.* ¶ 11.)  Livingston did not comply.  (*Id.*)  Wright concluded that Livingston was a safety threat and needed to be immobilized.  (*Id.* ¶ 14.)  Wright decided he would break Livingston's driver's side window "in an effort to reach Livingston," but as he got close, Livingston's dog "leaped across Livingston toward the window in an aggressive manner."  (*Id.* ¶ 13.)

About this time, Livingston became more responsive and opened the driver's

3

side door himself. (*Id.* ¶ 15.) Wright prevented the door from opening any wider than necessary to allow Livingston to exit, because Wright did not want to allow the dog out of the truck. (*Id.*) Wright assisted Livingston out of the truck by "guiding" him "with one hand." (*Id.* ¶ 16.) Livingston does not remember how he got out of the truck. (*Id.* ¶ 17.)

At this point, the parties' stories differ significantly. According to Defendants, Livingston remained standing, Wright handcuffed Livingston without resistance, and Wright guided Livingston to a prone position on the back seat of his patrol vehicle, with Gerson walking alongside—although Gerson made no physical contact with Livingston. (*Id.* at 7, ¶¶ 18–20; ECF No. 101 at 4–5, ¶¶ 2, 6, 11.) In contrast, Livingston claims that he remembers immediately falling to the ground, chest down, with his face turn to the left. (ECF No. 101 at 4, ¶ 1.) He further claims that, while on the ground, his arms "were raised forcefully behind his back and then upwards, placing extreme pressure on his shoulders and arms, which he described as excruciating and likened to touching an electric fence." (*Id.* ¶ 3.) Then, he says, he "felt himself being lifted up off the ground by the area around his waist and buttocks, until his legs and torso cleared the ground," but he blacked out at this point "either due to another seizure or from the intense pain he was experiencing," and the next thing he remembers is laying across the rear seat of the patrol vehicle, on top of his still-handcuffed wrists. (*Id.* at 5, ¶¶ 9–10.) As further support of this narrative, Livingston claims that the jeans he wore that night had a rear belt loop completely torn off. (ECF No. 97-1 at 7.) Finally, Livingston claims that the rough treatment by one or both police officers created "long-lasting and serious bodily injuries, some of which persist to this day," such as torn tendons and a left bicep that is no longer properly attached at the shoulder area. (ECF No. 101 at 5, ¶ 13; ECF No.

4

101-1 at 9–11.)

Regardless of the parties' conflicting stories, they agree that, by the time Livingston was in Wright's patrol vehicle, Wright had begun to suspect "that Livingston might be having a 'medical event.'" (ECF No. 97 at 7, ¶ 22.) An ambulance had already arrived at the scene, and Wright asked the paramedics to examine Livingston. Livingston was soon taken to the hospital, and spent a night there. (ECF No. 101-1 at 8.)

No charges were ever filed against him based on this incident (ECF No. 45 ¶ 21; ECF No. 71 ¶ 3), and "[t]he entire encounter [with Wright and Gerson] lasted no more than a couple of minutes" (ECF No. 97 at 7, ¶ 25).

## III. ANALYSIS

Defendants argue that Livingston cannot prove their direct liability for his alleged excessive force, that he cannot prove Gerson's liability for failure to intervene, and that they both are protected by qualified immunity.

**A.  General Standards**

1.  <u>Excessive Force</u>

"[A]ll claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard . . . ." *Graham v. Connor*, 490 U.S. 386, 395 (1989) (emphasis removed). Under this standard, "the question is whether the officers' actions are objectively reasonable in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Morris v. Noe*, 672 F.3d 1185, 1195 (10th Cir. 2012).

5

Applying this standard "requires careful attention to the facts and circumstances of each particular case, including [1] the severity of the crime at issue, [2] whether the suspect poses an immediate threat to the safety of the officers or others, and [3] whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396 (1989); *see also Lundstrom v. Romero*, 616 F.3d 1108, 1126 (10th Cir. 2010) (referring to the *Graham* factors as the "three, non-exclusive factors relevant to [an] excessive force inquiry"). The Court may further consider whether "the officers' own reckless or deliberate conduct during the seizure unreasonably created the need to use such force." *Cordova v. Aragon*, 569 F.3d 1183, 1188 (10th Cir. 2009) (internal quotation marks omitted).

2. Failure to Intervene

"An officer who fails to intervene to prevent a fellow officer's excessive use of force may be liable under § 1983." *Fogarty v. Gallegos*, 523 F.3d 1147, 1162 (10th Cir. 2008). "In order for liability to attach," however, "there must have been a realistic opportunity to intervene to prevent the harm from occurring. Whether an officer had sufficient time to intercede or was capable of preventing the harm being caused by another officer is [usually] an issue of fact . . . ." *Vondrak v. City of Las Cruces*, 535 F.3d 1198, 1210 (10th Cir. 2008).

3. Qualified Immunity

"Qualified immunity shields federal and state officials from money damages unless a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011). "The judges of the

6

district courts . . . [may] exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

The plaintiff bears the burden of demonstrating that the law was clearly established at the relevant time. *Lybrook v. Members of Farmington Mun. Sch. Bd. of Educ.*, 232 F.3d 1334, 1337 (10th Cir. 2000). "A right is clearly established in this circuit when a Supreme Court or Tenth Circuit decision is on point, or if the clearly established weight of authority from other courts shows that the right must be as the plaintiff maintains." *Thomas v. Kaven*, 765 F.3d 1183, 1194 (10th Cir. 2014) (internal quotation marks omitted). Nonetheless, the clearly established prong

> involves more than a scavenger hunt for prior cases with precisely the same facts. The more obviously egregious the conduct in light of prevailing constitutional principles, the less specificity is required from prior case law to clearly establish the violation. The Supreme Court has cautioned [lower] courts not to define clearly established law at a high level of generality, but to focus on whether the violative nature of particular conduct is clearly established.

*Perea v. Baca*, 817 F.3d 1198, 1204 (10th Cir. 2016) (internal quotation marks and citations omitted).

## B. Significance of Livingston's Partial Lack of Memory

In their Statement of Undisputed Material Facts, Defendants point out, accurately, that Livingston does not remember how he got out of his truck, nor does he remember what took place after the handcuffing. (ECF No. 97 at 6–7, ¶¶ 17–18.) But in the Argument portion of their summary judgment brief, Defendants argue as if they have established that Livingston has no memory of *any* portion of his encounter with

7

Defendants—although they vacillate between declaring that he categorically "does not remember what happened" and that he "cannot recollect the *main* events." (*Id.* at 8–11 (emphasis added).) Defendants therefore accuse Livingston of offering only "speculation" to support his claim that they applied excessive force. (*Id.* at 17–19.) And, in this light, Defendants say that their version of events—in which Livingston was handcuffed without resistance and with minimal force, and was guided to the police vehicle on his own feet—must be accepted as true.

In response, Livingston asserts that he *does* remember hitting the ground, having his arms wrenched (with the associated pain), feeling lifted off the ground, and waking up on top of his wrists in the back of the patrol vehicle. (ECF No. 101 at 7–10.) He also emphasizes his injuries, which did not exist before his encounter with Defendants. (*Id.* at 9.)

In reply, Defendants insist that "the undisputed facts confirm that [Livingston] does not recall [being handcuffed]," so Defendants' story must be accepted. (ECF No. 110 at 10.) This is either a hypertechnical evasion or irrelevant. It is true that Livingston does not recall the actual application of handcuffs to his wrists, but his claim that his arms were raised behind his back in an excessive and injurious manner does not turn on whether any Defendant manipulated his arms in that way *as part of the handcuffing process*. From Livingston's perspective, there was no legitimate law enforcement purpose under the circumstances to apply tendon-tearing force—whether in the midst of handcuffing or not—because it is undisputed that he offered no resistance. (*See* ECF No. 101 at 5, ¶ 6.)

Defendants' reply also goes to surprising lengths to avoid the implications of

Livingston's severe injuries, which he claims did not exist until the alleged rough treatment by Defendants. Defendants assert that Livingston's statements about his injuries are not "fact but rather an argument regarding damages and causation," and are therefore "immaterial to the legal analysis before the Court." (ECF No. 110 at 9, ¶ 13.) This is nonsensical. Defendants have apparently adopted a magical worldview where effects do not have causes. Under Defendants' logic, the presence of a gunshot wound is irrelevant to the question of whether a gun was fired. Obviously this is not the case, nor is it the case that the presence of shoulder injuries has no relevance to whether someone applied force sufficient to cause those injuries.

Accordingly, to the extent Defendants' motion turns on accepting their version as true due to Livingston's lack of memory, or on the supposed irrelevance of Livingston's injuries, those arguments are rejected. The Court now turns to the question of each officer's potential liability.

**C.   Wright**

There is a genuine dispute of material fact whether Wright wrenched Livingston's arms in the manner Livingston alleges. A reasonable jury could accept Livingston's memory of that event and the fact of his injuries, and therefore disbelieve Defendants' testimony to the contrary.

Similarly, there is a genuine dispute of material fact whether Wright carried Livingston in an unnecessary and painful way to the patrol vehicle. Livingston's memory of feeling lifted off the ground, his broken belt loop, and the severity of his injuries are enough for a reasonable jury to accept his theory of what happened, even though he blacked out as the alleged carrying began.

The Court will address qualified immunity together with Gerson's potential qualified immunity below in Part III.E.

**D.    Gerson**

Concerning the arm-wrenching event, Livingston "does not dispute Wright's contention that it was he alone who restrained him." (ECF No. 101 at 14.) Given this concession, any claim that Gerson is liable for wrenching Livingston's arms must fail. Moreover, given Livingston's description of the way his arms were manipulated and the intensity of the pain that resulted, no reasonable jury could find that Wright's action happened so slowly that Gerson had "a realistic opportunity to intervene." *Vondrak*, 535 F.3d at 1210. Accordingly, Gerson is entitled to summary judgment as to liability to the extent Livingston's injuries flow from Wright's alleged wrenching of his arms.

Concerning the allegedly unnecessarily rough carrying of Livingston from the ground to the back of Wright's police cruiser, the case is different. Defendants do not dispute Livingston's assertion that he "is relatively tall . . . whereas Wright is relatively short at 5'6["]." (ECF No. 101 at 14.) The Court therefore agrees with Livingston that, "[i]n his weakened state, and considering the size differential between Livingston and Wright, it is reasonable to infer that it would have taken the involvement of both officers to lift Livingston from the ground and carry him to the patrol car." (*Id.*) Thus, combined with his evidence that he *was* carried (*i.e.*, his memory of being lifted from the ground, and the torn belt loop), there is sufficient evidence to infer that Gerson assisted.

Even if Gerson did not assist, the facts as Livingston presents them (which a reasonable jury could accept) suggest that Wright's alleged act of carrying Livingston could not have happened so quickly that Gerson was deprived of a realistic opportunity

to intervene. Thus, as it relates to Livingston's allegation that he was carried to the police vehicle in an unnecessarily rough manner, Gerson is not entitled to summary judgment as to either direct or failure-to-intervene liability.[2]

**E. Qualified Immunity**

As for qualified immunity, the analysis has not changed from the motion to dismiss phase. As the Court then explained, if the jury finds the facts to be as Livingston represents, Wright was on notice in August 2014 that wrenching Livingston's arms with sufficient force to tear tendons, and both Defendants were on notice that carrying him as they allegedly did, was, under the circumstances, excessive. *See Livingston I*, 2017 WL 3896441, at *3–6; *see also Fisher v. City of Las Cruces*, 584 F.3d 888, 895–902 (10th Cir. 2009) (qualified immunity unavailable at summary judgment where the plaintiff's version of the facts, if believed, would constitute a violation of a clearly established right).

Defendants implicitly acknowledge that qualified immunity is unavailable on this record because they do *not* argue that they are entitled to qualified immunity *under Livingston's theory of the case*. In particular—and contrary to their arguments from the motion to dismiss phase—they do *not* argue that Livingston: (i) was thrashing due to his seizures, thus requiring forceful restraint, potentially including force sufficient to cause his lingering injuries; or (ii) needed help up from the ground. (*Compare* ECF No. 53

---

[2] The record does not reveal whether Livingston has evidence that being carried to the police vehicle in an unnecessarily rough manner caused injuries different from Wright's alleged arm-wrenching, or exacerbated those injuries in some quantifiable way. If he does not—if the evidence at trial gives the jury no basis to find that the carrying portion of Livingston's claim caused damages distinct from the arm-wrenching portion—then Gerson would likely be entitled to an instruction that, to the extent the jury found him liable, he could only be liable for nominal damages.

[Defendants' Motion to Dismiss] at 8 ("By Plaintiff's own admission, he was unable to control his body movements as a result of the seizure. Officers Wright and Gerson had to assist Plaintiff in moving his arms behind his back to complete handcuffing and to get Plaintiff off of the ground.").)[3] They instead argue only that they are entitled to qualified immunity based on their own version of events (which they believe cannot be disputed due to Livingston's lack of memory), and in that version of events, Livingston never fell to the ground and the process of handcuffing was unremarkable. (ECF No. 97 at 11–24.)

Accordingly, there are several genuine disputes of material fact that preclude any finding, at this phase, that the law was *not* clearly established. For all these reasons, Defendants are not presently entitled to qualified immunity on any of the theories the Court has found to present a factual dispute requiring a jury trial (Livingston's liability for the arm-wrenching and the carrying, and Gerson's liability for the carrying).[4]

### IV. CONCLUSION

For the reasons set forth above, the Court ORDERS as follows:

1. Defendants' Motion for Summary Judgment (ECF No. 97) is GRANTED to the extent that Defendant Gerson may not be held liable for injuries flowing from

---

[3] Defendants' characterization of Livingston's "admission" is exaggerated. His complaint never alleged that he was in the midst of a seizure during the time that Defendants manipulated his arms or picked him off the ground. (*See generally* ECF No. 45.)

[4] Although Livingston does not remember how he exited his vehicle or (according to him) how he ended up on the ground, he does not attribute his presence on the ground to some act of excessive force by Defendants. (ECF No. 101 at 7.) Defendants, however, claim that being forced to the ground was one of the excessive force theories the Court allowed to go forward in *Livingston I*, and they ask for summary judgment at least on that theory. (ECF No. 110 at 9.) The Court has never understood Livingston to be arguing that Defendants, or either of them, unlawfully forced him to the ground, and *Livingston I* does *not* discuss this as a possible excessive force theory. *See* 2017 WL 3896441, at *4–6. Accordingly, there is nothing on which to grant summary judgment because Livingston never brought such a claim in the first place.

Defendant Wright's allegedly excessive manipulation of Plaintiff's arms, but otherwise DENIED; and

2. As ordered (ECF No. 109), the parties shall contact the chambers of U.S. Magistrate Judge S. Kato Crews within two business days of this order to schedule a new Final Pretrial Conference.

Dated this 14th day of March, 2019.

BY THE COURT:

_____
William J. Martinez
United States District Judge